IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

PAMELA G. TORAIN,                        )
                                         )
                    Plaintiff,           )
                                         )
        v.                               )        1:17CV816
                                         )
NANCY A. BERRYHILL,                      )
Acting Commissioner of Social Security,  )
                                         )
                    Defendant.           )


MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Pamela G. Torain ("Plaintiff") brought this action pursuant to Sections 205(g)

and 1631(c)(3) of the Social Security Act (the "Act"), as amended (42 U.S.C. §§ 405(g) and

1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security

denying her claims for Disability Insurance Benefits and Supplemental Security Income under,

respectively, Titles II and XVI of the Act. The parties have filed cross-motions for judgment,

and the administrative record has been certified to the Court for review.

I.      PROCEDURAL HISTORY

Plaintiff protectively filed applications for Disability Insurance Benefits and

Supplemental Security Income Benefits on November 25, 2013 and November 20, 2013,

respectively, alleging a disability onset date of December 8, 2012 in both applications. (Tr. at

10, 266-77.)[1] Her applications were denied initially (Tr. at 101-130, 175-82) and upon

---

[1] Transcript citations refer to the Administrative Record [Doc. #7].

reconsideration (Tr. at 131-74, 189-206). Thereafter, Plaintiff requested an administrative hearing de novo before an Administrative Law Judge ("ALJ"). (Tr. at 207.) Plaintiff, along with her non-attorney representative and an impartial vocational expert, attended the subsequent hearing on July 21, 2016. (Tr. at 10.) The ALJ ultimately concluded that Plaintiff was not disabled within the meaning of the Act from her alleged onset date through August 23, 2016, the date of the administrative decision. (Tr. at 27.) On July 13, 2017, the Appeals Council denied Plaintiff's request for review of the decision, thereby making the ALJ's conclusion the Commissioner's final decision for purposes of judicial review. (Tr. at 1-5.)

II.   LEGAL STANDARD

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, the scope of review of such a decision is "extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (internal quotation omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1993) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is

evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472. "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Id. (quoting 42 U.S.C. § 423(d)(1)(A)).[2]

---

[2] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program (SSDI), established by Title II of the Act as amended, 42 U.S.C. § 401 et seq., provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program (SSI), established by Title XVI of the Act as amended, 42 U.S.C. § 1381 et seq., provides benefits to indigent disabled persons. The statutory definitions and the regulations promulgated by the Secretary for determining disability, see 20 C.F.R. pt. 404 (SSDI); 20 C.F.R. pt. 416 (SSI), governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1.

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4)). "Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at the first two steps, and if the claimant's impairment meets or equals a "listed impairment" at step three, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment," then "the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[3] Step four then requires the ALJ to assess whether, based on

---

[3] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the [Government] to prove that a significant number of jobs exist which the claimant could perform, despite the claimant's impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

III.    DISCUSSION

    In the present case, the ALJ found that Plaintiff had not engaged in "substantial gainful activity" since her alleged onset date. The ALJ therefore concluded that Plaintiff met her burden at step one of the sequential evaluation process. (Tr. at 12.) At step two, the ALJ further determined that Plaintiff suffered from the following severe impairments:

> osteoarthritis of the bilateral hips; degenerative disc disease; hypertension; an affective disorder; an anxiety disorder; obesity; and carpal tunnel syndrome.

(Id.) The ALJ found at step three that none of these impairments, individually or in combination, met or equaled a disability listing. (Tr. at 13-15.) Therefore, the ALJ assessed Plaintiff's RFC and determined that she could perform light work with further limitations. (Tr. at 15.) Specifically, the ALJ found that Plaintiff

> can frequently reach overhead and in all other directions, and handle, and finger with her right upper extremity, and handle and finger frequently with her left upper extremity. [Plaintiff] can never climb ladders, ropes, or scaffolds, but can

occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. [Plaintiff] can never work at unprotected heights or around moving, mechanical parts. Further, [Plaintiff] is limited to the performance of simple, routine, and repetitive tasks, and is limited to simple work-related decision[s]. She can frequently interact with supervisors, coworkers, and the general public.

(Id.) Based on this determination, the ALJ found under step four of the analysis that Plaintiff could not perform any of her past relevant work. (Tr. at 25.) However, the ALJ concluded at step five that, given Plaintiff's age, education, work experience, and RFC, along with the testimony of the vocational expert regarding those factors, Plaintiff could perform other jobs available in the national economy and therefore was not disabled. (Tr. at 25-27.)

Plaintiff now raises numerous challenges to the ALJ's RFC assessment. She first claims that the "ALJ erred by failing to include in the RFC, or mention in the hypothetical question to the [vocational expert], all of [Plaintiff's] significant limitations." (Pl.'s Br. [Doc. #12] at 3.) Specifically, she contends that the RFC fails to sufficiently account for (1) her moderate limitation in concentration, persistence, and pace, (2) her moderate limitation in social functioning, (3) her need for a low-stress setting, (4) her need for a cane, (5) her fatigue and daytime sleepiness, and (6) her carpal tunnel syndrome. Plaintiff also challenges the ALJ's assignment of little weight to the medical opinions of Dr. Hansen Su and Dr. Jonathan Klein. After a careful review of the record, the Court finds that substantial evidence supports the ALJ's decision.

A.     RFC Determination

1.     Concentration, persistence, and pace

At step three of the sequential analysis, the ALJ determined that Plaintiff has moderate limitations in concentration, persistence, and pace. In <u>Mascio v. Colvin</u>, 780 F.3d 632 (4th

Cir. 2015), the Fourth Circuit explained that where such limitations are reflected at step three, the ALJ should address those limitations in assessing the RFC or should explain why the limitations do not affect the claimant's ability to work. The Fourth Circuit specifically held that "an ALJ does not account for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work." Mascio, 780 F.3d at 638 (quotation omitted). This is because "the ability to perform simple tasks differs from the ability to stay on task. Only the latter limitation would account for a claimant's limitation in concentration, persistence, or pace." Id. The Fourth Circuit further noted that

> [p]erhaps the ALJ can explain why Mascio's moderate limitation in concentration, persistence, or pace at step three does not translate into a limitation in Mascio's residual functional capacity. For example, the ALJ may find that the concentration, persistence, or pace limitation does not affect Mascio's ability to work, in which case it would have been appropriate to exclude it from the hypothetical tendered to the vocational expert. But because the ALJ here gave no explanation, a remand is in order.

Id. (internal citation omitted). However, as previously noted in other cases in this District, the Fourth Circuit's decision in Mascio

> does not broadly dictate that a claimant's moderate impairment in concentration, persistence, or pace always translates into a limitation in the RFC. Rather, Mascio underscores the ALJ's duty to adequately review the evidence and explain the decision. . . .
>
> An ALJ may account for a claimant's limitation with concentration, persistence, or pace by restricting the claimant to simple, routine, unskilled work where the record supports this conclusion, either through physician testimony, medical source statements, consultative examinations, or other evidence that is sufficiently evident to the reviewing court.

Tolbert v. Colvin, 1:15CV437, 2016 WL 6956629, at *8 (M.D.N.C. Nov. 28, 2016) (finding that RFC limitations to "simple, routine, repetitive tasks with simple, short instructions, in a

job that required making only simple, work-related decisions, involved few workplace changes, and required only frequent contact with supervisors, co-workers, or the public" sufficiently accounted for a Plaintiff's moderate limitations in concentration, persistence, or pace in light of the ALJ's explanation throughout the administrative decision) (quoting <u>Jones v. Colvin</u>, No. 7:14CV00273, 2015 WL 5056784, at *10-12 (W.D. Va. Aug. 20, 2015)).

In the present case, as in <u>Mascio</u>, the ALJ found moderate limitations in concentration, persistence, or pace at step three of the sequential analysis. (Tr. at 14.) Later in the sequential analysis, the ALJ formulated a mental RFC limiting Plaintiff to simple, routine, and repetitive tasks with a further limitation to simple, work related decisions. (Tr. at 15.) The issue, therefore, is whether the ALJ's discussion of, and reliance on, substantial record evidence adequately explains why Plaintiff's moderate limitation at step three did not translate into any additional RFC limitations. <u>See, e.g.</u>, <u>Jones</u>, 2015 WL 5056784, at *3-4; <u>Del Vecchio v. Colvin</u>, No. 1:14CV116, 2015 WL 5023857, at *5-6 (W.D.N.C. Aug. 25, 2015); <u>Walker v. Colvin</u>, No. 6:14-cv-00025, 2015 WL 5138281, at *11 (W.D. Va. Aug. 31, 2015).

In the present case, the ALJ did find that "[w]ith regard to concentration, persistence or pace, [Plaintiff] has moderate difficulties." (Tr. at 14.) However, the ALJ specified that "[i]n this domain, the [ALJ] determined that [Plaintiff] has moderate difficulties in her ability to concentrate and persist." Thus, the ALJ specified that the limitations were in Plaintiff's ability to concentrate and persist. Moreover, in setting the RFC, the ALJ gave great weight to the consultative psychological evaluation by Dr. Amy Johnson, who found that Plaintiff may have difficulty maintaining concentration, persistence, and pace, but would nevertheless not be prevented from performing simple, routine, repetitive tasks. (Tr. at 23.) Finally, the ALJ

also gave great weight to the opinions of the State agency psychological consultants, Dr. Nancy Lloyd and Dr. Lori Brandon Souther, both of whom found that Plaintiff had moderate limitations in concentration, persistence, and pace, but that she remained capable of simple, routine, repetitive tasks. (Tr. at 24, 109-13, 143-44, 150.) In fact, when asked to "[e]xplain in narrative form [Plaintiff's] sustained concentration and persistence capacities and/or limitations," Dr. Souther wrote, "Claimant has some limitations in attention and concentration but appears capable of performing SRRTs." (Tr. at 149.) The ALJ relied on these findings in formulating Plaintiff's mental RFC, thus providing sufficient consideration and explanation of the reasoning and evidence supporting the determination. See, e.g., Davis v. Berryhill, 1:17CV372, 2018 WL 1726248, at *8 (M.D.N.C. Apr. 6, 2018); Ingram v. Berryhill, 1:17CV17, 2018 WL 1054511, at *4 (M.D.N.C. Feb. 23, 2018); Trent v. Berryhill, 1:16CV89, 2017 WL 1409574, at *10 (M.D.N.C. Apr. 20, 2017). In the specific circumstances presented here, the Court finds no basis for reversal.

### 2. Additional mental restrictions

In two closely-related arguments, Plaintiff next contends that, despite assigning great weight to the assessments of the state agency consultants Dr. Souther and Dr. Lloyd, the ALJ failed to adequately include all of the mental limitations opined by Dr. Souther with respect to (1) Plaintiff's limitations in social functioning and (2) Plaintiff's need for a low-stress environment. See Mascio, 780 F.3d at 636 ("Remand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review.") (internal quotations omitted.) In the present case, however, the ALJ did assess

Plaintiff's ability to perform relevant functions, including with respect to social functioning and a low-stress environment, and the ALJ sufficiently explained the basis for the RFC in light of the evidence in the record.

To the extent that Plaintiff contends that the ALJ failed to address preliminary ratings included the state agency forms, these ratings do not constitute the consultants' ultimate RFC assessments. Rather, the evaluating psychologists are asked to explain, in narrative form, their reasons for the degree of limitation opined and the impact of the limitations on Plaintiff's ability to perform basic work activities. "It is the conclusions of state agency psychologists set forth in Section III ..., and not their initial summary conclusions set forth in Section I, that are ultimately relevant to the calculation of a plaintiff's mental RFC." Bacnik v. Colvin, No. 1:12-CV-801, 2014 WL 3547387, at *4 (M.D.N.C. July 17, 2014) (citing Program Operations Manual System ("POMS") 24510.060(B.2.a)). Here, as discussed above, both State agency psychological consultants ultimately concluded that, despite the varied, underlying limitations identified in Section I of their forms, Plaintiff remained capable of performing simple, routine, repetitive tasks. In light of Dr. Souther's further findings that Plaintiff required "a low stress setting with minimal social demands" (Tr. at 150), the ALJ further limited Plaintiff to "simple, work-related decision[s]," and no more than "frequent interact[ion] with supervisors, coworkers, and the general public." (Tr. at 15.) Thus, the ALJ specifically addressed Plaintiff's limitations both as to social functioning and the need for a low-stress environment, taking Dr. Souther's ultimate conclusions into account in making that determination and setting the RFC.

Plaintiff nevertheless contends that the RFC limitation to no more than "frequent interact[ion] with supervisors, coworkers, and the general public" failed to adequately

incorporate Dr. Souther's proposed limitation to work "with minimal social demands." (Tr. at 150.) However, in terms of social interaction, the ALJ specifically noted, when assigning great weight to the State agency opinions, that he accorded them great weight to the extent they were "consistent with the objective medical evidence of record, and with [Plaintiff's] subjective testimony, in which [she] reported that she was able to visit with friends, and spend time with her children." (Tr. at 24.) The ALJ also gave great weight to the consultative psychological evaluation of Dr. Johnson, who opined that Plaintiff "would have no difficulty interacting with peers and coworkers or with responding appropriately to supervision." (Tr. at 23, 420.) Thus, the ALJ considered the evidence as a whole, including Dr. Souther's evaluation which was given great weight, Dr. Johnson's evaluation which was given great weight, and Plaintiff's testimony regarding her ability to visit with friends and spend time with her children. Taking all of that into account, the ALJ addressed Plaintiff's limitations in social functioning by including in the RFC a limitation to no more than "frequent interact[ion] with supervisors, coworkers, and the general public," thus precluding jobs that required constant interaction with others. (Tr. at 15.) In the circumstances, the ALJ's determination is sufficient to allow for meaningful review, and is supported by substantial evidence.

Plaintiff similarly contends that the ALJ erred by failing to include Dr. Souther's proposal that Plaintiff be limited to a "low stress setting." However, the ALJ specifically addressed this proposal by limiting Plaintiff to "simple work-related decision[s]." This limitation reasonably addresses Dr. Souther's conclusion that Plaintiff "has some difficulty with frustration tolerance but appears capable of managing a stable, low-stress work assignment." (Tr. at 150.) To the extent that Plaintiff contends that a "low stress" job, by

definition, must preclude production work, she provides no basis for this assertion, and even if that were the case, none of the jobs identified at step five of the sequential analysis involve production work, making any error on this ground harmless under the facts of this case. (Tr. at 26.) For all of these reasons, the Court concludes that Plaintiff's contentions do not warrant reversal in the circumstances of this case.

        3.     Cane use

Plaintiff next challenges the RFC's failure to account for Plaintiff's use of a non-prescribed cane. "The requirement to use a hand-held assistive device may . . . impact [a claimant's] functional capacity by virtue of the fact that one or both upper extremities are not available for such activities as lifting, carrying, pushing, and pulling." 20 C.F.R. Part 404, Subpt. P, App. 1 § 1.00(J)(4). Accordingly, an ALJ must consider the impact of a "medically required" hand-held assistive device on a claimant's RFC. See McLaughlin v. Colvin, No. 1:12CV621, 2014 WL 12573323, at *2 (M.D.N.C. July 25, 2014); Social Security Ruling 96-6p, Policy Interpretation Ruling Titles II And XVI: Determining Capability To Do Other Work— Implications Of A Residual Function Capacity For Less Than A Full Range Of Sedentary Work, 1996 WL 374185, at *7 (July 2, 1996) ("SSR 96-9p").

Social Security Ruling 96-9p explains the impact of an assistive device on an RFC for sedentary work, and courts within this circuit have applied this ruling "to the light occupational base as well, since it involves even greater lifting than sedentary work. . . . Additionally, a plaintiff always bears the burden of proving her RFC, and therefore the standards in SSR 96-9p can be useful in determining if a plaintiff met that burden." Timmons v. Colvin, No.

3:12CV609, 2013 WL 4775131, at *8 (W.D.N.C. Sept. 5, 2013). Notably, SSR 96-9p provides

the following guidance:

> To find that a hand-held assistive device is medically required, there must be
> medical documentation establishing the need for a hand-held assistive device to
> aid in walking or standing, and describing the circumstances for which it is
> needed (i.e., whether all the time, periodically, or only in certain situations;
> distance and terrain; and any other relevant information). The adjudicator must
> always consider the particular facts of a case. For example, if a medically
> required hand-held assistive device is needed only for prolonged ambulation,
> walking on uneven terrain, or ascending or descending slopes, the unskilled
> sedentary occupational base will not ordinarily be significantly eroded.

SSR 96-9p, 1996 WL 374185, at *7. In short, "even if a cane is prescribed, it does not

necessarily follow that it is medically required." Wimbush v. Astrue, No. 4:10CV36, 2011 WL

1743153, at *3 (W.D. Va. May 6, 2011).

In the present case, as correctly noted by the ALJ, "medical records indicate that while

[Plaintiff] used a cane and a walker prior to her bilateral hip replacements, her gait and mobility

were greatly improved following these surgeries." (Tr. at 22, 498-99, 554-56, 631-33.) Plaintiff

now cites a single record from January 2016 as evidence that she continued to require a cane

after her hip replacements. (Pl.'s Br. at 7.) In that record, Dr. Irene Whitt, Plaintiff's

rheumatologist, "Advised cane use, which [Plaintiff] hates," in the course of her examination.

(Tr. at 628.) However, Dr. Whitt never described the circumstances under which Plaintiff

should use a cane, and Plaintiff herself testified that she only used it once or twice a week,

when she went shopping, and never at home. (Tr. at 69.) Accordingly, substantial evidence

supports the ALJ's finding that Plaintiff's cane use was not medically required.

4. Fatigue and daytime sleepiness

Plaintiff also contends that the ALJ failed to account for her allegations of fatigue and

daytime sleepiness in the RFC. Specifically, Plaintiff testified that she experiences daytime sleepiness because she doesn't sleep well at night despite having a CPAP machine for sleep apnea. (Tr. at 68.) The ALJ acknowledged this testimony, but found that Plaintiff's obstructive sleep apnea diagnosis was "without support from any objective findings or any treatment records." (Tr. at 13.) He therefore found Plaintiff's sleep apnea "not medically determinable." (Id.)

As to this determination, the Court notes that there are no sleep studies in the record, but Plaintiff's treatment records do reflect a diagnosis of sleep apnea and use of a CPAP machine. However, "[a]s long as the ALJ determines that the claimant has at least one severe impairment and proceeds to discuss all of the medical evidence, any error regarding failure to list a specific impairment as severe at step two is harmless." McClain v. Colvin, No. 1:12CV1374, 2014 WL 2167832, at *4 (M.D.N.C. May 23, 2014) (citations omitted).

Here, even if sleep apnea should have been included as a severe impairment at step two, any error is harmless, since the ALJ found other severe impairments and considered all of the medical evidence in setting the RFC. The ALJ specifically noted Plaintiff's testimony that "her medications cause drowsiness and dizziness" and the she used a CPAP machine. (Tr. at 16.) As Defendant correctly notes, the record indicates improvement in Plaintiff's symptoms with CPAP use, and specifically that Plaintiff reported feeling "much better than usual" after starting treatment. (Tr. at 575-81.) Plaintiff's testimony regarding her daytime sleepiness further clarifies that it stemmed not only from apnea, but from the sedative effect of her pain medications. (Tr. at 68.) The ALJ determined that the record as a whole failed to support Plaintiff's allegations of more extreme symptoms and limitations (Tr. at 22), and

Plaintiff does not challenge that finding.[4]  Most significantly, Plaintiff never suggests the need for additional limitations stemming from her sleep apnea, and none are apparent from the record.  Therefore, the Court finds no basis for remand.

     5.     Carpal tunnel syndrome

In her final challenge to the RFC, Plaintiff contends that the ALJ's decision to limit Plaintiff to frequent handling and fingering failed to adequately account for Plaintiff's carpal tunnel syndrome.  (Pl.'s Br. at 8.)  However, the ALJ specifically considered the medical records regarding Plaintiff's carpal tunnel syndrome:

> In January 2016, the claimant returned for treatment with her orthopedic specialist, at which time, she was diagnosed with moderate-to-severe carpal tunnel syndrome. At this time, it was recommended that she begin wearing a brace on a daily basis. Electrodiagnostic testing was abnormal, and was consistent with moderate left carpal tunnel syndrome affecting both the sensory and motor fibers, but was without any Electrodiagnostic evidence of axonopathy. However, at an appointment in February 2016, it was noted that the claimant refused to wear braces for her carpal tunnel syndrome. A physical examination in March 2016 showed that the claimant had full flexion and extension of all lesser digits and the thumb, along with full thumb opposition. She had decreased sensibility to the median dermatome, along with positive Tinel's and positive Phalen's, but negative Froment's and negative Wartenber's testing. At this time, conservative measures were recommended for her carpal tunnel syndrome, including wearing splints at night, taking vitamin B6 twice a

---

[4] In making this determination, the ALJ considered the medical record and also considered Plaintiff's testimony regarding how she spends her days.  (Tr. at 16, 74-75.)  The ALJ noted that "although [Plaintiff] has alleged that she is too limited to work, she testified that during the day, she takes care of her two children, including a five-year old that is not yet in school and a nine-year-old that has developmental delays.  She also reported that she was able to help her husband with his business, play and do crafts with her children, wash the dishes and the laundry, go to the library, and prepare[] meals for her family.  Furthermore, at a therapy appointment in June 2014, [Plaintiff] reported that her son was out of school, so she was implementing 'Camp Mommy' and spending more time with him."  (Tr. at 22.)

day, and receive a Cortisone injection. At this appointment, she was given a
cortisone injection.

(Tr. at 19.) Thus, as noted by the ALJ, the records reflect that Plaintiff's treatment for carpal

tunnel syndrome had begun recently, testing was consistent with moderate left carpal tunnel

syndrome, and her doctors recommended treatment with conservative measures, including

wearing splints at night, taking vitamin B6, and receiving a Cortisone injection. (Tr. at 20.)

These records do not reflect an inability to handle and finger, and the ALJ noted that Plaintiff's

"carpal tunnel syndrome has not resulted in an inability to perform fine and gross movements

effectively." (Tr. at 13.) The ALJ then took Plaintiff's carpal tunnel syndrome into account

in the RFC, finding that Plaintiff was limited to frequent handling and fingering, thus

precluding positions involving constant handling and fingering. Plaintiff does not suggest

what further limitations, if any, are warranted. Moreover, to the extent Plaintiff relies on her

own testimony regarding the extent of her limitations, the ALJ found that her subjective

allegations of limitation were not fully supported by the record, and Plaintiff does not

challenge that determination. To the extent Plaintiff relies on Dr. Klein's opinion that Plaintiff

could only occasionally use her hands, the ALJ assigned that opinion little weight, as discussed

below. In the circumstances, Plaintiff fails to show that the ALJ's failure to include more

stringent limitations constitutes reversible error.

B.      Treating Physician Opinions

Plaintiff next disputes the ALJ's assignment of little weight to the July 2016 medical

opinions of Dr. Su and Dr. Klein. Because both Dr. Su and Dr. Klein served as Plaintiff's

treating providers, Plaintiff specifically challenges the ALJ's application of 20 C.F.R.

§ 404.1527(c)(2), better known as the "treating physician rule." The Fourth Circuit has held

that for claims, like Plaintiff's, filed before March 24, 2017, ALJs must evaluate medical opinion evidence in accordance with 20 C.F.R. § 404.1527(c) and the "treating physician rule" embodied within the regulations. Brown v. Comm'r Soc. Sec., 873 F.3d 251, 255 (4th Cir. 2017). Under these regulations, "medical opinions" are "statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." Id. (citing 20 C.F.R. § 404.1527(a)(1)). While the regulations mandate that the ALJ evaluate each medical opinion presented to him, generally "more weight is given to the medical opinion of a source who has examined you than to the medical opinion of a medical source who has not examined you." Brown, 873 F.3d at 255 (quoting 20 C.F.R. § 404.1527(c)(1)). The ALJ generally accords the greatest weight— controlling weight—to the well-supported opinion of a treating source as to the nature and severity of a claimant's impairment, based on the ability of treating sources to

> provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) [which] may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(c)(2). However, if a treating source's opinion is not "well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record," it is not entitled to controlling weight. SSR 96-9p, 1996 WL 374188, at *5; 20 C.F.R. § 404.1527(c)(2); see also Brown, 873 F.3d at 255; Craig, 76 F.3d at 590; Mastro, 270 F.3d at 178.[5] Instead, the opinion must be evaluated and weighed

---

[5] For claims filed after March 27, 2017, the regulations have been amended and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded. The new regulations provide that the Social

using all of the factors provided in 20 C.F.R. § 404.1527(c)(2)-(c)(6), including (1) the length of the treatment relationship, (2) the frequency of examination, (3) the nature and extent of the treatment relationship, (4) the supportability of the opinion, (5) the consistency of the opinion with the record, (6) whether the source is a specialist, and (7) any other factors that may support or contradict the opinion. Moreover, even if an opinion by a treating physician is given controlling weight with respect to the nature and severity of a claimant's impairments, opinions by physicians regarding the ultimate issue of whether a plaintiff is disabled within the meaning of the Act are never accorded controlling weight because the decision on that issue is reserved for the Commissioner alone. 20 C.F.R. § 404.1527(d).

Where an ALJ declines to give controlling weight to a treating source opinion, he must "give good reasons in [his] . . . decision for the weight" assigned, taking the above factors into account. 20 C.F.R. § 404.1527(c)(2). "This requires the ALJ to provide sufficient explanation for 'meaningful review' by the courts." <u>Thompson v. Colvin</u>, No. 1:09CV278, 2014 WL 185218, at *5 (M.D.N.C. Jan. 15, 2014) (quotations omitted).

In the present case, Dr. Klein completed a three-page, form medical statement supplied by Plaintiff's attorney on July 8, 2016. Rather than asking Dr. Klein to posit functional limitations based on his medical findings, the form provided as follows:

> The patient alleges that she is limited in any prolonged unassisted walking/standing to no more than 15-20 minutes at a time, with the need to rest up to an hour after such activity, limited in lifting/carrying no more than 7-8 pounds only occasionally and limited in prolonged upright sitting to no more than 20-25 minutes at a time, with the need to frequently alternate positions;

Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources." 20 C.F.R. § 404.1520c. However, the claim in the present case was filed before March 27, 2017, and the Court has therefore analyzed Plaintiff's claims pursuant to the treating physician rule set out above.

and no repetitive stooping, bending, crouching or reaching out or up with the upper extremities. She further alleges limitations in repetitive good use of bilateral hands.

In your opinion, are these allegations credible and consistent with your findings and her history and condition?

(Tr. at 650.) In short, the form simply listed limitations as subjectively determined by Plaintiff and/or her attorney and asked Dr. Klein to agree with them. He did so, writing only a single word, "Yes." (Id.) On the second page of the form, Dr. Klein indicated with checkmarks that Plaintiff could only occasionally "use bilateral hands for repetitive gripping/grasping, manipulation and/or keyboard work" and that her "experience of pain, stress, fatigue and the side-effects of any necessary pain medication" could be expected to frequently interfere with her attention, concentration, and focus. (Tr. at 651.) Dr. Klein again answered "Yes" when asked, in his opinion, if "the physical/mental stressors of any consistent full-time . . . work activity [would be] likely to exacerbate [Plaintiff's] several symptoms and overall condition." (Id.) When asked, in a follow-up question, to estimate how many days a month Plaintiff would be likely to miss work due to her medical conditions, Dr. Klein checked "4 or more days a month[.]" (Tr. at 652.) He then explained as follows:

[The] combination of pain and fatigue would likely cause her to miss work. Much of the supporting evidence regarding imaging and blood tests would come from her rheumatologist Dr. Irene Whitt and her orthopedic surgeon Dr. Brett Gilbert and Rosie Polinski at the Triangle Orthopedic pain clinic.

(Id.) The ALJ ultimately assigned Dr. Klein's opinions little weight. In doing so, the ALJ explained that he was "mindful" of Dr. Klein's treatment relationship with Plaintiff. Nevertheless, he rejected Dr. Klein's opinions for three reasons: (1) it "is primarily a 'box-check' opinion," (2) "the explanation that [Dr. Klein] does provide ostensibly defers to other

doctors, Dr. Whitt, Dr. [G]ilbert, and Dr. Pol[i]nsk[y]," and (3) "[the] conclusions suggested by Dr. Klein are not supported by his treatment notes." (Tr. at 23.)

As an initial matter, where, as here, an opinion consists of a minimally-completed checkbox form, the ALJ may reasonably conclude that it is of limited probative value. See Coleman v. Colvin, No. 1:15CV751, 2016 WL 4223583, at *6 (M.D.N.C. Aug. 9, 2016), report and recommendation adopted, No. 1:15CV751, 2016 WL 5372817 (M.D.N.C. Sept. 26, 2016) (finding that the ALJ properly assigned no weight to a nurse practitioner's opinions where she provided "little-to-no explanation of the evidence used to form her opinions, which [we]re set forth either in short and conclusory letters or in a check box form, and the record lack[ed] objective medical evidence in support of her conclusory assertions") (citing Mason v. Shalala, 994 F.2d 1058, 1065 (3d Cir. 1993) ("Form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best."); see also McGlothlen v. Astrue, No. 7:11-cv-148-RJ, 2012 WL 3647411, at *6 (E.D.N.C. Aug. 23, 2012) (finding a form questionnaire "entitled to little weight" due to lack of explanation); Bishop v. Astrue, No. 1:10-2714-TMC, 2012 WL 951775, at *3 n.5 (D.S.C. Mar. 20, 2012) (same).

In the present case, Dr. Klein provided only a limited objective basis for his check box opinion. Specifically, Dr. Klein referenced objective testing from Plaintiff's rheumatologist, Dr. Whitt, Plaintiff's orthopedic surgeon, Dr. Brett Gilbert, and Rosemarie Polinsky, PA-C, who treated Plaintiff at Triangle Orthopaedic Associates. (Tr. at 652.) This testing includes imaging and EMG results showing lumbar and cervical degenerative disc disease with no acute abnormality or instability; minor scoliosis; and left moderate carpal tunnel syndrome. (Tr. at 18, 19, 409, 412, 565, 566, 620.) However, none of these test results, in and of themselves,

support the extreme limitations opined by Dr. Klein, and Dr. Klein fails to make such a connection. Instead, as noted by the ALJ, Dr. Klein simply defers to the other doctors, which the ALJ reasonably concluded was a basis to assign the opinion less weight. Moreover, as the ALJ also correctly notes, Dr. Klein's own treatment notes similarly fail to reflect the degree of limitation Plaintiff suggests. These notes document Plaintiff's subjective complaints of joint, neck, and back pain. However, aside from blood tests consistent with anemia, Dr. Klein generally recorded normal or mildly abnormal physical findings on exam, including full strength and good range of motion despite occasional tenderness or stiffness. (Tr. at 577, 580, 595, 597, 602.) Certainly, none of Dr. Klein's exam findings support his opinions that Plaintiff is "limited in lifting/carrying no more than 7-8 pounds only occasionally," "limited in prolonged upright sitting to no more than 20-25 minutes at a time," or limited to only occasional use of her hands. (See Tr. at 650-51.)[6] As such, the Court finds that substantial evidence supports the ALJ's assignment of little weight to Dr. Klein's opinion.

Similarly, Plaintiff's psychiatrist, Dr. Su, completed a two-page form questionnaire on July 5, 2016. (Tr. at 647-48.) Dr. Su indicated that Plaintiff had been diagnosed with generalized anxiety disorder and major depressive disorder which were treated with Cymbalta and brief counseling. (Tr. at 647.) Question 3 of the form then asked as follows:

> The patient alleges she has several chronic and severe symptoms of depression that significantly affect and nullify her ability to function successfully in a routine full-time work setting.
>
> In your opinion, is this allegation credible, and resulting from an identifiable medical conditions [sic]; as well as consistent with your clinical findings and longitudinal knowledge of the patient's history and condition?

---

[6] As noted by Defendant, Dr. Klein's notes actually reflect that Plaintiff was advised to exercise regularly and contact Vocational Rehabilitation. (Tr. at 591.)

(Id.)  Dr. Su answered, "Yes.  Patient also has chronic pain and congestive heart failure."  (Id.)  When next asked if Plaintiff had "a substantial loss of ability to perform any of the following basic mental work-related activities on a consistent full-time basis in competitive employment," Dr. Su indicated three activities with check marks:  "Responding appropriately to the stressors of dealing with supervision, co-workers and usual interpersonal work situations," "Dealing with changed in a routine work setting," and "Maintain[ing] concentration, attention and focus, and behav[ing] in an emotionally stable and reliable manner."  (Tr. at 648.)  Finally, when asked if, in his opinion, "the stressors and demands" of full-time work would be likely to exacerbate Plaintiff's mental symptoms, Dr. Su responded, "Yes, both mental and physical symptoms would be exacerbated."  (Id.)  He further indicated with a check mark that Plaintiff's conditions would cause her to miss work "4 or more days a month."  (Id.)

> The ALJ assigned Dr. Su's opinions little weight, explaining as follows:
>
> Although Dr. Su is [Plaintiff's] treating [psychiatrist], this is a "box check" opinion without any analysis or explanation.  Moreover, these checks are inconsistent with the treatment records, which note in pertinent part that [Plaintiff's] depressive symptoms are improving.

(Tr. at 23.)  The Court finds that substantial evidence supports this assessment.  As set out above, "box check" opinions may reasonably be determined to be of limited probative value, and the forms in question here, minimally completed by Dr. Su, offer no basis for increased reliance.  In fact, the primary opinion offered by Dr. Su, that Plaintiff's severe depressive symptoms "nullify" her ability to perform full-time work (Tr. at 647), is an issue reserved to the Commissioner and therefore entitled to no weight, see 20 C.F.R. § 404.1527(d).  In

addition, as noted by the ALJ, Dr. Su did not provide further analysis or explanation. Indeed, his only real explanation refers to Plaintiff's physical impairments, noting that "Patient also has chronic pain and congestive heart failure," which is outside his area of treatment. Moreover, as noted by the ALJ, the opinions included in the form are inconsistent with the treatment records. As reflected in the records, Plaintiff's depressive symptoms appear to fluctuate due to situational stressors throughout Dr. Su's treatment records. (See Tr. at 605-15, 642-46.) However, Dr. Su's most recent treatment note, dated June 21, 2016, approximately two weeks before his opinion, documents Plaintiff's assertion that Cymbalta is "working ok" and that her depressive symptoms were improving. (Tr. at 642, 645.)[7] Thus, the ALJ gave multiple reasons, supported by substantial evidence, for assigning little weight to the opinion of Dr. Su, and the Court will not re-weigh the evidence or reconsider the ALJ's determination. Accordingly, the Court finds no basis for remand.

IT IS THEREFORE RECOMMENDED that the Commissioner's decision finding no disability be AFFIRMED, that Plaintiff's Motion for Judgment on the Pleadings [Doc. #11] be DENIED, that Defendant's Motion for Judgment on the Pleadings [Doc. #13] be GRANTED, and that this action be DISMISSED with prejudice.

This, the 30th day of August, 2018.

/s/ Joi Elizabeth Peake
United States Magistrate Judge

---

[7] Plaintiff's testimony at the hearing likewise reflected that her mental impairments were improving. (Tr. at 72.)